**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **COLLEGE PARK PENTECOSTAL** | * | |
| **HOLINESS CHURCH** | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Civil No.: **PJM 09-2070** |
| | * | |
| **GENERAL STEEL CORP., et al.** | * | |
| | * | |
| Defendants | * | |

## <u>MEMORANDUM OPINION</u>

College Park Pentecostal Holiness Church ("the Church") has sued General Steel Corporation, General Steel Domestic Sales LLC, and Christopher Davis (collectively "Defendants"), alleging that they fraudulently induced the Church to enter into a contract which the Church believed was for the construction of a building to be used as a place of worship, but which in fact was only for the supply of materials and components for the building, not its construction. The Church further alleges that Defendants violated Maryland consumer protection laws.

Defendants filed a Motion to Dismiss or in the Alternative to Compel Arbitration, and after hearing oral argument, the Court issued an Order that denied the Motion to Dismiss and granted the Motion to Compel to the extent that it required the merits of the Church's Complaint to be resolved in arbitration, but deferred consideration of whether one or more terms of the arbitration clause were unenforceable for unconscionability or otherwise. The Court requested additional briefing from the parties, which the parties have now submitted. For the reasons that follow, the Court finds several of the provisions of the arbitration clause unconscionable and

unenforceable and will **ORDER** that the merits of the Church's Complaint be arbitrated in Maryland, minus the offending terms.

## I.

The Church alleges that in December 2006 one of its representatives, Pastor Jamil Kahn, entered into discussions by phone with Christopher Davis, an employee of General Steel Corporation, with regard to the possible construction of a building by General Steel on the Church's property in College Park, Maryland.  According to the Church, Davis represented to Kahn that General Steel would provide a "turnkey" building ready for occupancy and would handle all zoning, design, site planning, and general contracting work.   General Steel faxed the contract to Kahn on January 11, 2007.  That same day, based on Davis's representations, Kahn signed and returned the contract.

The cover page of the contract, which was marked "Urgent," stated that the document was a "standard Purchase Agreement" and directed Kahn to initial the "CONDITIONS" page before faxing the document back to General Steel.  The Purchase Agreement outlined the Church's "STEEL BUILDING SPECIFICATIONS," and a stamp on the page made clear that the "MANAGER PRICE" would only be valid through January 11, 2007, the very day the contract arrived.  Farther down the page, in small block print, the Purchase Agreement stated, "BUYER HEREBY ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS AGREEMENT AND AGREES TO ALL THE TERMS HEREIN CONTAINED. . . . ALL DISPUTES SHALL BE ARBITRATED PURSUANT TO PARAGRAPH 6 OF THE CONDITIONS PAGE."

Paragraph Six of the "CONDITIONS" page, which Kahn separately initialed, provided:

Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be resolved by arbitration before the Judicial Arbiter Group, Inc. in Denver,

> Colorado.  Any challenge relating to the entire agreement or any subpart thereto, arbitration of any controversy, and confirmation of any arbitration award shall be only in Denver, Colorado.  Any such challenge that relates to whether claims are arbitrable shall obligate the challenging party to pay the attorney's fees and costs of defense to the non-challenging party.  The party initiating arbitration shall advance all costs thereof.  This agreement shall be governed by and interpreted in accordance with the laws of the State of Colorado.  The Federal Arbitration Act shall govern the interpretation, enforcement, and proceedings pursuant to the arbitration clause in this agreement.  The arbitrator will have no authority to award punitive, consequential or other purely non-compensatory damages, except as may be required by statute. . . .

Paragraph Seven of the Agreement, which Kahn also initialed, stated that "[i]f any provision of this agreement or any part thereof is invalid, unlawful or incapable of being enforced, it shall be severed and the remaining provisions given full force and effect."

Kahn signed and initialed the Agreement on January 11, 2007, the same day he received it, and immediately faxed it back to General Steel.  On January 12, Kahn sent General Steel a check for $45,000 as a deposit under the contract.  Approximately one year later, in January 2008, Kahn signed a "Building Change Order," which added a mezzanine level to the planned building, and sent General Steel another check for $50,000.  Due to the increased price of the mezzanine, however, the parties later executed a second Change Order that restored the original design of the building.  Notably, Defendants never returned the $50,000 following the execution of the second Change Order.

The Church submits that following payment of the deposits, Defendants informed it that they would in fact provide no assistance with site planning, zoning, or construction and would only supply materials for the building.  The Church thereupon demanded that Defendants return the deposits, claiming it had no intention of entering into a "materials only" contract, but Defendants refused.  The instant lawsuit was filed on August 6, 2009.

As indicated, after hearing oral argument on Defendants' Motion to Dismiss or in the Alternative to Compel Arbitration, the Court denied the Motion to Dismiss but granted their

alternative Motion to Compel Arbitration to the extent that it required the merits of the Church's complaint to be resolved in arbitration. The Court held open the issue of whether one or more of the terms of the arbitration clause were enforceable and requested that the parties submit additional briefing on the question of enforceability, given the obvious distance, cost, and inconvenience to the Church of having to arbitrate in Colorado. The Court also directed the Church to file an affidavit and other documentation to substantiate its financial situation and the expected costs of arbitrating the case in Colorado. To this end, the Church submitted the affidavit of Lorraine Ryan, an Elder of the Church with personal knowledge of its financial records.

According to Ryan, as of the time of the affidavit, the Church's assets included a savings account totaling $32,736.00 and a checking account, after deducting outstanding liabilities, consisting of $2,319.00. The Church received an income of approximately $24,000.00 per month in donations but incurred approximately $20,000.00 per month in expenses. Ryan attested that she had confirmed that the Judicial Arbiter Group in Denver, Colorado would charge on average $395.00 per hour for an arbitrator's services. The Church estimated that an arbitrator would spend between twenty-six to thirty-six hours resolving this case—consisting of two days of hearings and ten additional hours of work—for an arbitrator's fee of approximately $14,220.00. Additional costs of arbitration would include the cost of retaining Colorado counsel and transportation and housing expenses for a minimum of three days for at least two individuals representing the Church. To date, the Church's Maryland counsel has charged only expenses for his legal representation, and has stated that he is unable to devote the time necessary to handle arbitration in Colorado. The Church has contacted several attorneys in Denver, all of whom indicated that it would take some 50 hours to handle the arbitration and draft a post-hearing

memorandum.  These attorneys reported on average a fee of $325.00 per hour, which would

bring their fees to a total of about $17,500.00.  As for travel and accommodations expenses for

two Church representatives, those may be estimated at $700.00 and $1,275.00, respectively, a

total of $1,975.00.[1]  Given an approximate total cost of $33,695.00 to arbitrate in Colorado,

Ryan has averred that arbitrating the dispute would effectively eliminate all of the Church's

remaining assets and likely jeopardize its continued existence.

Defendants argue that the arbitration clause should be fully enforced as written.

## II.

The Federal Arbitration Act, 9 U.S.C. §§ 1-16, provides the governing legal framework

for this case.  Under § 2 of the statute, "[a] written provision in . . . a contract evidencing a

transaction involving commerce to settle by arbitration a controversy thereafter arising out of

such contract . . . shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at*

*law or in equity for the revocation of any contract*." *Id.* § 2 (emphasis added).  Thus, an

arbitration provision may be found unenforceable where it violates applicable federal common

law, *see, e.g.*, *Bradford v. Rockwell Semiconductor Sys., Inc.*, 238 F.3d 549 (4th Cir. 2001), or on

the basis of "generally applicable contract defenses, such as fraud, duress, or unconscionability .

. . ." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).

In this case, federal common law addressing whether arbitration provisions should be

invalidated because of prohibitive cost does not assist the Church.[2]  True, the U.S. Supreme

---

[1] This estimate is based on searches for the cost of roundtrip airline tickets between Baltimore and Denver ($350 x 2 = $700), *see* KAYAK, http://www.kayak.com (last visited on Dec. 29, 2011), as well as hotel accommodations, *see* TRIPADVISOR, http://www.tripadvisor.com (last visited on Dec. 29, 2011), and meal and local transportation expenses for two individuals for three days in Denver ($1,275.00).

[2] Although "[a]n agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause," *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974), precedent controlling judicial forum selection clauses under federal law is inapposite with respect to the choice of situs expressed in an arbitration agreement

Court in *Green Tree Financial Corp.-Alabama v. Randolph* ruled that a party challenging an

arbitration agreement on the basis of financial hardship might be able to show that the likelihood

of incurring prohibitive costs effectively deprives it of its ability to seek redress. 531 U.S. 79, 92

(2000); *see also Bradford v. Rockwell Semiconductor* Systems, 238 F.3d 549, 556-57 (4th Cir.

2001).  But the underlying claim in *Green Tree* was based on two federal statutes, the Truth in

Lending Act, 15 U.S.C. §§ 1601-1616, and the Equal Credit Opportunity Act, 15 U.S.C. §§

1691-1691f, not state law.  531 U.S. at 518; *see also Blair v. Scott Specialty Gases*, 283 F.3d

595, 605 (3d Cir. 2002) (prohibitive cost analysis for claim under Title VII of the Civil Rights

Act of 1964); *Bradford*, 238 F.3d at 552, 557-58 (prohibitive cost analysis for claim under the

Age Discrimination in Employment Act).  At least three federal courts of appeals have held that

the prohibitive cost doctrine articulated in *Green Tree* is limited to employment agreements

where federal statutory rights are at issue.  *See Stutler v. T.K. Constructors, Inc.*, 448 F.3d 343,

345 (6th Cir. 2006) (finding *Green Tree* limited by its plain language to "the question of whether

an arbitration clause is enforceable where federal statutorily provided rights are affected"); *Pro

Tech Indus., Inc.*, *URS Corp.*, 377 F.3d 868, 873 (8th Cir. 2004) (same); *Brown v. Wheat First

Sec., Inc.*, 257 F.3d 821, 824-26 (D.C. Cir. 2001) (finding circuit precedent so limited).

On the other hand, notwithstanding the limited reach of *Green Tree*, the Church may still

argue that the arbitration clause in this case, or some portion of it, is unenforceable because it

runs afoul of generally applicable state contract law.  *See Gay v. CreditInform*, 511 F.3d 369,

---

because the Federal Arbitration Act provides the exclusive legal standard.  *See Silkworm Screen Printers, Inc. v. Abrams*, No. 91-1631, 1992 WL 317187, at *4 (4th Cir. Nov. 4, 1992) (citing *Sam Reisfeld & Son Import Co. v. S.A. Etco*, 530 F.2d 679, 680-81 (5th Cir. 1976)); *Nat. Iranian Oil Co. v. Ashland Oil, Inc.*, 817 F.2d 326, 332 (5th Cir. 1987); *Aspen Spa Properties, LLC v. Int'l Design Concepts, LLC*, 527 F. Supp. 2d 469, 472 (E.D. N.C. 2007). The Church, therefore, cannot look to *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972) and its progeny to challenge the requirement that it arbitrate its claims in Denver, Colorado.  *See, e.g.*, *Banks Channel LLC v. Brands*, No. 11-1204, 2011 WL 2535266, at *2 (D.P.R. June 27, 2011) (holding that plaintiff could not rely on the unreasonableness test of *M/S Bremen* in asking the court to move arbitration from Barbados to Puerto Rico).

388 (3d Cir. 2007) ("[N]otwithstanding the supremacy of federal law, courts repeatedly have held that 'in interpreting [arbitration] agreements, federal courts may apply state law, pursuant to section two of the FAA.") (brackets in original); *Hill v. PeopleSoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005) (applying Maryland law in analyzing the validity of an arbitration contract). Several state courts, for example, have considered the issue of prohibitive cost under the rubric of unconscionability in cases involving state law claims.[3]  *See, e.g.*, *Harrington v. Pulte Home Corp.*, 119 P.3d 1044, 1055-56 (Ariz. Ct. App. 2005); *Bess v. Directv, Inc.*, 885 N.E.2d 488, 498 (Ill. App. Ct. 2008); *Walther v. Sovereign Bank*, 872 A.2d 735, 751-53 (Md. 2005); *Tillman v. Commercial Credit Loans, Inc.*, 655 S.E.2d 362, 370-73 (N.C. 2008); *In re Olshan Found. Repair Co.*, 328 S.W.3d 883, 891-95 (Tex. 2010).  Moreover, the Supreme Court has advised lower federal courts to "remain attuned to well-supported claims that [an] agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract.'"  *Mitsubishi Motors*, 473 U.S at 627 (quoting 9 U.S.C. § 2). Here, the contract between the parties expressly provides that its terms "shall be governed and interpreted in accordance with the laws of the state of Colorado," a provision which the Church does not object to.  The pertinent question, then, is the enforceability vel non of what may be unconscionable provisions of an arbitration clause under Colorado law.

Under Colorado law, an arbitration clause, as with any clause in a contract, may be invalidated if it is deemed unconscionable.  *See Davis v. M.L.G. Corp.*, 712 P.2d 985, 991 (Colo. 1986) (declining to enforce a contract provision deemed unconscionable); *Estate of Grimm v. Evans*, 251 P.3d 574, 576 (Colo. App. 2010) (noting that an arbitration provision may be found

---

[3] Courts, however, may not "invalidate arbitration agreements under state laws applicable *only* to arbitration provisions." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (emphasis in original) (citations omitted). The Federal Arbitration Act precludes states "from singling out arbitration provisions for suspect status." *Id.*

unconscionable).  Unconscionability is a mixed question of law and fact to be decided by the

court.  *Mullan v. Quickie Aircraft Corp.*, 797 F.2d 845, 850 (10th Cir. 1986).

A finding of unconscionability must be supported by "evidence in the record of some

overreaching on the part of one of the parties, such as that which results from an inequality of

bargaining power or other circumstances in which there is an absence of meaningful choice on

the part of the second party, together with contract terms unreasonably favorable to the first

party."  *Leprino v. Intermountain Brick Co.*, 759 P.2d 835, 836 (Colo. App. 1988) (citing *Davis*,

712 P.2d at 991); *see also Mullan*, 797 F.2d at 850 (quoting *Davis*, 712 P.2d at 991).  Factors

relevant to the unconscionability determination include:

> [A] standardized agreement executed by parties of unequal bargaining strength; lack of
> opportunity to read or become familiar with the document before signing it; use of fine
> print in the portion of the contract containing the provision; absence of evidence that the
> provision was commercially reasonable or should reasonably have been anticipated; the
> terms of the contract, including substantive unfairness; the relationship of the parties,
> including factors of assent, unfair surprise and notice; and all the circumstances
> surrounding the formation of the contract, including its commercial setting, purpose and
> effect.

*Davis*, 712 P.2d at 991 (internal citations omitted); *see also Bernal v. Burnett*, 793 F. Supp. 2d

1280, 1285-87 (D. Colo. 2011) (applying *Davis* factors).  "Contract terms, particularly in a

transaction involving a consumer, will be found unconscionable when they defeat the reasonable

expectations of the parties."  *Leprino*, 759 P.2d at 836 (citing *Davis*, 712 P.2d at 985).

An arbitration provision in an agreement is severable from the remainder of the contract.

*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006).  Where a party challenges

the validity of an arbitration provision on a ground that directly affects the entire agreement or on

the ground that illegality of one of the contract's terms renders the whole contract invalid, a court

must enforce the severable arbitration provision, and the challenge should be considered by an

arbitrator, not a court.  *Id.* at 444-46.  In contrast, where a party specifically challenges the

validity of an arbitration provision—but not the broader agreement—the question of validity is decided by the court rather than the arbitrator.  *See id.* at 445-46, 448-49; *Howard v. King's Crossing, Inc.*, 264 F. App. 345, 346-47 (4th Cir. 2008).

## III.

### A.

Defendants advance two arguments why the arbitration clause in this case should be enforced as written, neither of which the Court finds persuasive.  They first maintain that an arbitrator, not this Court, must resolve the parties' dispute, including the viability of the venue provision, because the Church challenges the contract as a whole, not the arbitration clause specifically.  *See Buckeye Check Cashing*, 546 U.S. at 445; *Estate of Grimm v. Evans*, 251 P.3d 574, 576 (Colo. App. 2010).  This argument is simply at odds with the procedural history of the case.  When the Court granted in part Defendants' Motion to Dismiss or in the Alternative to Compel Arbitration, it specifically ordered the parties to arbitrate, but asked the parties to further brief the issue of enforceability of certain provision of the arbitration clause, including most prominently the situs of the arbitration, given the possible inconvenience and cost of requiring the Church to arbitrate in Denver, Colorado.  In its supplemental brief, the Church specifically attacked the "enforceability of the arbitration clause" as "part of a multiple part analysis" that courts use in examining "such issues as venue under the principle of forum non-convenience [*sic*]."  The clause was unenforceable, the Church asserted, because of the hardship of "litigating and/or arbitrating in Colorado."  The Church claimed that the cost of transporting witnesses and securing the assistance of local counsel made it inequitable to require arbitration in Colorado.

In this regard, the Court directed the Church to file an affidavit and other appropriate documentation to substantiate claims as to its financial situation as well as the expected costs of

arbitrating in Colorado.  Pursuant to that order, the Church filed the Ryan affidavit, previously discussed.  The affidavit set forth in some detail the Church's assets, its income and expenses, and the expected cost of arbitrating the case in Denver.  The Court finds the Church's challenge sufficiently specific to the arbitration clause that it may be considered by the Court.  *See Howard*, 264 F. App. at 346-47 (finding that district court properly considered validity of arbitration clause where the issue was squarely before the court notwithstanding the fact that the complaint challenged the contract as a whole).

Defendants next argue that the Church's challenge to enforcement of the arbitration clause fails because the Church relies on inapposite case law.  The Church cannot invoke *Green Tree Financial Co.-Alabama v. Randolph*, 531 U.S. 79 (2000), and its progeny, say Defendants, because those cases involved alleged violations of federal statutory rights.  While the Court has already stated its agreement with this contention, the Church nevertheless remains able to raise the issue of prohibitive cost by challenging the provision under state law generally applicable to contracts.  Determining whether an agreement is unconscionable under Colorado law requires consideration of the "terms of the contract, including substantive unfairness." *Davis v. M.L.G. Corp.*, 712 P.2d 985, 991 (Colo. 1986).  Accordingly, the manner in which the agreement in the instant case purports to allocate the cost of arbitration and how much money a party would likely have to spend arbitrating are relevant to the inquiry.  *Cf. Walther v. Sovereign Bank*, 872 A.2d 735, 751-53 (Md. 2005) (considering arbitration fees and costs in evaluating whether arbitration agreement was unconscionable).

**B.**

The Court considers whether one or more terms of the arbitration clause in the Purchase Agreement are enforceable in light of Colorado law.  Fully cognizant that Colorado public policy

"strongly favors the resolution of disputes through arbitration," *Rains v. Found. Health Sys. Life & Health*, 23 P.3d 1249, 1251 (Colo. App. 2001) (citations omitted), the Court concludes that some terms of the clause are indeed unconscionable and therefore unenforceable.

The arbitration clause in this case provides in pertinent part:

> Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be resolved by arbitration before the Judicial Arbiter Group, Inc. in Denver, Colorado. Any challenge relating to the entire agreement or any subpart thereto, arbitration of any controversy, and confirmation of any arbitration award shall be only in Denver, Colorado. Any such challenge that relates to whether claims are arbitrable shall obligate the challenging party to pay the attorney's fees and costs of defense to the non-challenging party. The party initiating arbitration shall advance all costs thereof.

The Court evaluates these provisions according to the factors set forth in *Davis v. M.L.G. Corp.*, 712 P.2d 985, 991 (Colo. 1986).

Considering the first *Davis* factor, it is readily apparent that the arbitration clause was part of a standardized agreement executed by parties of unequal bargaining strength. General Steel sent Pastor Kahn the front and back of its so-called "standard Purchase Agreement," and pressured him to sign and return it the same day he received it. The terms and conditions of the contract, including the arbitration clause, were not subject to negotiation. According to General Steel's website, it is a "worldwide leader" in the steel building industry with "years of building design experience." *See* GENERAL STEEL, http://www.gensteel.com (last visited Dec. 29, 2011). In contrast, from all appearances neither Kahn nor the Church possessed the least business sophistication, including experience with contracts or in the field of construction generally. *Cf. Planned Pethood Plus, Inc. v. KeyCorp, Inc.*, 228 P.3d 262, 266 (Colo. App. 2010) (holding that prepayment penalty term was not unconscionable in part because the plaintiffs had previously negotiated commercial loans, at least two of which contained prepayment penalty clauses). Additionally, Khan conducted his discussions with Defendants without the benefit of counsel,

and a few weeks later, signed the Purchase Agreement as the Church's representative again

without the benefit of counsel.  This factor weighs heavily against enforceability of the forum

selection clause.  *Cf. Clinic Masters, Inc. v. District Court in and for the County of El Paso*, 556

P.2d 473, 475-76 (Colo. 1976) (holding that forum selection clause was not unconscionable in

part because there was no evidence of unequal bargaining power between the parties and the

party challenging the provision was a professional with business experience); *DEX Media, Inc. v.*

*Nat'l Mgmt. Servs., Inc.*, 150 P.3d 1093, 1100-01 (Or. Ct. App. 2007) (applying Colorado law

and enforcing arbitration clause in part because of the relatively equal bargaining positions of the

parties and their business relationship).

As for the second *Davis* factor, it is also clear that the Church had little time to read and

familiarize itself with the Purchase Agreement before signing it.  Kahn received the contract on

January 11, 2007.  The cover page was marked "Urgent" and the Agreement was stamped

"MANAGER PRICE . . . VALID THROUGH 01-11-07 ONLY."  To ensure that the Church

received the discount price, Kahn was obliged to execute the contract and return it on the same

day he received it.  It is true that the Purchase Agreement was only two pages in length and

contained relatively little legalese.  Yet the same day turn-around hardly gave the Church the

opportunity to appreciate the significance of its terms, especially the potential onerousness of

having to arbitrate in Colorado should it find it necessary to challenge any aspect of Defendants'

performance.  Again, the Church had no recourse to legal counsel.  The second *Davis* factor

therefore weighs against enforcement of the forum selection clause.

In contrast, the third *Davis* factor tends to favor enforcement of the arbitration clause.

The portion of the Purchase Agreement that contains the arbitration clause uses normal—

approximately size twelve font—not fine print.  The language is legible and not otherwise

obscured.  *See Mullan v. Quickie Aircraft Corp.*, 797 F.2d 845, 851-52 (10th Cir. 1986) (no unconscionability in part because the agreement did not contain fine print or boiler plate language).

As to the fourth *Davis* factor, however, Defendants have not presented evidence that each and every provision they inserted in the arbitration clause was commercially reasonable or should reasonably have been anticipated by the Church.  The Court is hard pressed to conclude that it is commercially reasonable to require the representatives of a financially modest church to travel three-quarters of the way across the country to arbitrate its claims, pay Defendants' attorneys' fees and costs if it challenges arbitrability (whether the challenge is successful or not), and advance all costs of arbitration.  *Cf. id.* at 851-53 (finding that disclaimer provision should have been reasonably anticipated given the terms of the contract, the circumstances surrounding formation of the contract, plaintiff's expertise in the field, and plaintiff's awareness of the risks involved); *Bernal v. Burnett*, 793 F. Supp. 2d 1280, 1288 (D. Colo. 2011) (noting that the arbitration agreement appeared to contain "relatively standard terms," suggesting that they were substantively fair); *Lincoln Gen. Ins. Co., v. Bailey*, 224 P.3d 336, 341-42 (Colo. App. 2009) (finding that insurance exclusion provision in rental car contract was not unconscionable in part because such exclusions were common in the industry); *DEX Media, Inc. v. Nat'l Mgmt. Servs., Inc.*, 150 P.3d 1093, 1100-01 (Or. Ct. App. 2007) (applying Colorado law and finding that arbitration clause that provided remedial alternatives to only one party was not oppressive because it was commercially reasonable).  The fourth *Davis* factor thus argues against enforceability of not only the forum selection clause, but also of the requirement of payment up front of all arbitration costs, including Defendants' attorneys' fees and costs in the event arbitrability is challenged.

The next *Davis* factor requires the Court to examine the terms of the arbitration clause and determine whether they are substantively unfair.  The Court has done so and concludes that most of the provisions are clearly lopsided in favor of Defendants.  The Court finds no reason to challenge the *bona fides* of the designated arbitrator, the Judicial Arbiter Group, Inc.[4]  But the fact remains that General Steel is located in Lakewood, Colorado, part of the Denver metropolitan area.  The Church is located in College Park, Maryland, over 1,400 miles away.  And again, if the Church merely undertakes to challenge enforcement of any aspect of the arbitration clause, it must "pay the attorney's fees and costs of defense to the non-challenging party," i.e., Defendants, whether the Church prevails on the point or not.

Perhaps more important, as the party "initiating arbitration," the Church is apparently obliged to "advance all costs thereof."  In other words, even if the Church were to obtain a favorable outcome through arbitration, it would still be obligated to put forward Defendants' fees and costs and the arbitrator's fees and costs.  Nothing in the contract allows for deferral of payments or shifting fees and costs to the losing party.  Courts have expressed concern about fee-splitting provisions in arbitration clauses that require an aggrieved party to pay even one half of an arbitrator's fees.  *See, e.g.*, *Shankle v. B-G Management of Colorado, Inc.*, 163 F.3d 1230, 1235 (10th Cir. 1999) (holding arbitration clause that required former employee to pay one half of arbitrator's fees unenforceable); *cf. Bradford v. Rockwell Semiconductor Sys., Inc.*, 238 F.3d 549, 558 (holding that arbitration clause was enforceable because former employee failed to

---

[4] The Judicial Arbiter Group "is composed exclusively of former trial and appellate Judges, each of whom were distinguished leaders and Judges during service on the bench." *See JAG The Firm*, JUDICIAL ARBITER GROUP, http://www.jaginc.com /pages/thefirm.php   (last visited, Dec. 29, 2011).

prove that fee-splitting provision prevented him from vindicating his rights).  Here, the Church

faces a worse situation, having to advance *all* costs of arbitration.[5]

The costs the Church would incur in arbitrating its claims before the Judicial Arbiter

Group are more than substantial.  First, it may have to pay Defendants' attorneys' fees and costs,

which, it may be assumed, would approximate those of the Church ($17,500.00 x 2 = $35,000.00

total).  Next, according to Lorraine Ryan's testimony, the Judicial Arbiter Group charges on

average $395.00 per hour for an arbitrator's services, a number Defendants do not dispute.  Nor,

in effect, do Defendants challenge Ryan's estimate that an arbitrator would have to spend

between twenty-six to thirty-six hours on this case, resulting in a fee of up to $14,220.00.  The

Church would also be obligated to shoulder any additional arbitration expenses, such as

administrative services, whatever those might be.  Finally, the Church would have to pay for

travel and accommodation expenses for its witnesses to attend the arbitration, estimated at

$1,975.00.

Defendants do not contest Lorraine Ryan's estimate that an attorney representing the

Church would have to spend approximately 50 hours handling the arbitration.  Defendants'

argument that hiring new counsel might not be necessary, the implication being that the Church

could either appear without counsel, or that current Maryland counsel, presumably out of the

goodness of his heart, could offer his services without charge, is altogether fatuous.  This case is

far too complex for the Church members to handle by themselves, and their counsel has already

voiced his understandable unwillingness to handle the arbitration in Colorado pro bono.

Defendants' contention that if Colorado counsel were needed, Ryan has overestimated the

---

[5] In the Court's experience of 26 years as a state and federal trial judge, having considered dozens of arbitration
clauses, it has never come across a clause as oppressive as this.

average hourly rate and ignored the possibility of contingency fee arrangements, is also fatuous. Even $250.00 rather than $325.00 per hour would result in a significant sum over the projected 50 hours of attorney time.  Moreover, it is highly unlikely that any Colorado counsel worth his or her salt would be willing to sign onto this case on a contingency basis.  Finally, Defendants' suggestion that "telephonic appearances or preservation depositions" might suffice ignores the fact that they would be clearly weak substitutes for live appearances.

The approximate cost from the Church's standpoint would mount up quickly: some $14,220.00 in arbitrator fees, $17,500.00 in its own legal fees, $1,975.00 in travel and accommodation expenses, and an additional $17,500.00 to cover Defendants' legal fees, for a total of $51,195.00.  Of this, the arbitrator's fees ($14,220.00) and costs and those of Defendants' attorneys ($17,500.00), a total of $31,720.00, presumably would have to be paid in advance.  The balance of the Church's costs, i.e. airfare and hotel, would also essentially be payable up front.  These expenses must be measured against the approximately $35,000.00 in total assets and net income of about $4,000 per month that the Court has at its disposal.  Given this gross disparity, the cost of arbitration that the Church would incur if Defendants' arbitration clause were fully enforceable can only be described as unconscionable.

In addition to the costs of arbitration itself, the arbitration clause in the Purchase Agreement provides that "confirmation of any arbitration award" and any further challenge to the Agreement "shall be only in Denver, Colorado."  Thus, even if the Church obtained a favorable outcome in arbitration, it would have to incur more expenses defending that award in the Colorado courts.  Further litigation adds to the cost of arbitrating and serves as a deterrent to arbitration in the first place.  The fifth *Davis* factor, by far the most important, weighs heavily against enforcement of several of the arbitration provisions.

The sixth *Davis* factor—the relationship between the Church and Defendants—has in effect already been addressed.  The parties were (and are) of unequal bargaining power; notice and assent occurred in less than a day due to pressure exerted by Defendants; and the gist of the Church's complaint is unfair surprise.  In all, this factor also weighs against enforcement of the venue provision.

The seventh and last *Davis* factor requires the Court to evaluate "all the circumstances surrounding the formation of the contract, including its commercial setting, purpose and effect." *Davis*, 712 P.2d at 991.  This is essentially an overview of all the factors just discussed.  Kahn and Defendants entered into discussions at a distance quite removed from one another and Kahn was pressured to execute the Purchase Agreement on the same day he received it.  The Church alleges, and Defendants have yet to deny, that the latter's representative told Kahn that General Steel would provide a "turnkey" building ready for occupancy and would handle all zoning, design, site planning, and general contracting work, a representation the Church maintains was totally false when made.

Finally, it does not pass notice that Defendants' sales practices have been seriously called into question in other jurisdictions.  In a case brought by the State of Colorado itself pursuant to its consumer protection statute in 2004, a court found that General Steel had made intentionally false and misleading representations, including those related to its role in supplying buildings as well as its purported clearance prices, and that General Steel had also omitted material information in its advertising.  *See State of Colorado ex rel. Salazar v. Gen. Steel Domestic Sales LLC*, No. 04-cv-143 (Colo. Dist. Ct. Dec. 7, 2004).  In 2005, the Office of Attorney General of New Mexico issued a press release warning churches in that state about General Steel and its offers to sell complete buildings.  *See* Press Release, Office of the Attorney General, State of

New Mexico (Nov. 2, 2005), *available at* http://www.nmag.gov/Articles/archive/2005/html/11-02-05_general_steel.htm.  The Church asserts that Defendants have yet again engaged in sharp dealings.  Perhaps so, perhaps not.  What is undisputed, however, is that as a result of signing the contract with General Steel and making the required deposits, the Church has lost $95,000, *which Defendants claim is non-refundable*, including—incredibly—the $50,000 deposit the Church made for a change Defendants agree was duly cancelled.

In sum, the *Davis* factors weigh significantly in support of a finding that several of the provisions of the arbitration clause are unconscionable, and the Court so finds.  They amply demonstrate the two elements required for a finding of unconscionability under *Davis*—stark inequality of bargaining power between the parties and terms that unreasonably favor one side over the other.  *See Davis v. M.L.G. Corp.*, 712 P.2d 985, 991 (Colo. 1986) (citing *McMillion v. McMillion*, 522 P.2d 125 (Colo. App. 1974)).  This case involves more than just a disparity of bargaining strength and a "'simple old-fashioned bad bargain.'"  *Univ. Hills Beauty Acad., Inc. v. Mountain States Tel. & Tel. Co.*, 554 P.2d 723, 730 (Colo. App. 1976) (quoting *Wille v. Sw. Bell Tel. Co.*, 549 P.2d 903, 907 (Kan. 1976)).  This is a case where "no decent, fair[-]minded person would view the ensuing result" of enforcement of the arbitration provisions "without being possessed of a profound sense of injustice . . . ."  *Univ. Hills Beauty Acad.*, 554 P.2d at 726 (quoting *Carlson v. Hamilton*, 332 P.2d 989, 991 (Utah 1958)).

## IV.

Whether particular terms of a contract are severable depends on the intentions of the parties.  *Cornerstone Group XXII, LLC v. Wheat Ridge Urban Renewal Auth.*, 151 P.3d 601, 608 (Colo. App. 2006), *rev'd on other grounds, Wheat Ridge Urban Renewal Auth. v. Cornerstone Group XII, LLC*, 176 P.3d 737 (Colo. 2007).  Paragraph Seven of the Purchase Agreement states

that "[i]f any provision of this agreement or any part thereof is invalid, unlawful or incapable of being enforced, it shall be severed and the remaining provisions given full force and effect." This paragraph evinces the parties' unequivocal intent to preserve the agreement notwithstanding limited infirmities.  *Id.* (upholding district court's refusal to void entire contract based on severability provision).

Accordingly, consistent with the parties' intent and federal and state policy favoring arbitration, *see Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 (1983); *Rains v. Found. Health Sys. Life & Health*, 23 P.3d 1249, 1251 (Colo. App. 2001), the Court will excise the unconscionable provisions of the arbitration clause, and will enforce the remaining ones.  *See also Stout v. J.D. Byrider*, 228 F.3d 709, 715 (6th Cir. 2000) (noting that any "doubts as to the parties' intentions should be resolved in favor of arbitration.") (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)).  The Court will **STRIKE** those portions of the arbitration clause (1) designating "the Judicial Arbiter Group, Inc. in Denver, Colorado," as the sole arbitrator for any controversy or claim arising out of or relating to the contract, or breach thereof; (2) declaring that "Denver, Colorado" is the only place where any challenge relating to the agreement, arbitration of any controversy, and confirmation of any arbitration award can be heard; (3) compelling the party that challenges arbitrability "to pay the attorney's fees and costs of defense to the non-challenging party;" and (4) requiring the party "initiating arbitration" to "advance all costs thereof."  Otherwise, the agreement to arbitrate will be enforced.

**V.**

Since the Court has held that arbitration of the Church's claims on the merits remains appropriate, the Court will direct that the arbitration go forward, but that it be held in this District, minus the described unconscionable provisions.[6]

## V.

For the foregoing reasons, the Court **ORDERS** that the merits of the Church's Complaint shall be arbitrated in Maryland, applying Colorado law.[7]

A separate Order will **ISSUE**.

/s/
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

January 19, 2012

---

[6] Enforcement of the remaining provisions of the arbitration clause is governed by 9 U.S.C. § 4.  That section provides in relevant part:

> The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed.

The Court recognizes that by ordering arbitration in Maryland, it is transferring the burden of travel, accommodation, and related expenses from the Church to Defendants. But this should not come as an unfair surprise to Defendants. The primary location of performance under the contract was Maryland and Defendants availed themselves of the opportunity to do business with a Church located in College Park, Maryland.

[7] The parties may wish consult the American Arbitration Association in order to provide an appropriate framework for arbitration in Maryland. *See* AMERICAN ARBITRATION ASSOCIATION, http://www.adr.org/ (last visited Dec. 29, 2011).